NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

JERMAINE LAMAR HOUSTON, *Appellant*.

No. 1 CA-CR 25-0179

FILED 05-29-2026

Appeal from the Superior Court in Maricopa County
No. CR2023-158850-001
The Honorable Max Covil, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Alice Jones
*Counsel for Appellee*

Brown & Little PLLC, Chandler
By Matthew O. Brown
*Counsel for Appellant*

**MEMORANDUM DECISION**

Presiding Judge Andrew M. Jacobs delivered the decision of the Court, in which Judge Brian Y. Furuya and Judge James B. Morse Jr. joined.

**J A C O B S**, Judge:

¶1 This appeal is filed in accordance with *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297 (1969). Counsel for Jermaine Lamar Houston has advised this Court that counsel found no arguable questions of law and has asked this Court to search the record for reversible error. Houston was convicted of one count of disorderly conduct, one count of possession of dangerous drugs for sale, and one count of possession of narcotic drugs for sale. Houston was given an opportunity to file a supplemental brief but has not done so. After reviewing the record, we affirm Houston's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2 We view the facts in the light most favorable to sustaining the convictions and resolve all reasonable inferences against Houston. *See State v. Fontes*, 195 Ariz. 229, 230 ¶ 2 (App. 1998).

### A. Arrest

¶3 On December 28, 2023, E.L. was driving her husband's truck through her mother's apartment complex looking for parking when she accidentally backed into Houston's vehicle. E.L.'s mother and four-year-old daughter were also inside the truck. E.L. testified that after the collision, Houston exited his vehicle and "grab[bed] the gun out of his holster" before walking toward her truck with the handgun at his side. According to E.L., Houston approached the driver's side window yelling and asking for money because she had "messed up [his] car." E.L. testified that while Houston was speaking, he was "moving the gun the whole entire time," and that although the gun may have been pointed directly at her only "for like a few seconds," the barrel was "pointing everywhere honestly" as he gestured and spoke. E.L. further testified that Houston said he was "going to shoot the car up" while "trying to come up with a solution." She stated that Houston demanded "at least like around $500."

¶4 E.L. testified about her encounter with Houston. His firearm was a small black handgun, "probably like a Glock." Neither she nor anyone in her vehicle had a gun nor said anything threatening to Houston. She immediately took responsibility for the accident and apologized when Houston approached the truck. She felt "scared and concerned mostly," including concern "[f]or [her] safety" and the safety of her daughter who remained in the truck during the encounter. She believed she needed to

"remain calm" because "you don't know what could happen when there is a gun pointed at you."

¶5        Houston called 911 after the collision and told the dispatcher that he was armed, though he said his gun was holstered. Phoenix Police Department ("PPD") Officers responded to the scene and contacted Houston. Officer Tatge testified that when she asked Houston whether he was armed, Houston lifted his shirt and showed her an empty holster attached to his pants. Houston told the officer that after E.L. backed into his vehicle, he "got out of his vehicle, pulled his gun out, but did not point it at anyone." Officer Tatge further testified that Houston later stated his 16-year-old son had taken the gun from him and put it away because Houston was concerned about having a seizure. Houston did not specify where the gun had been placed but mentioned that "the gun might be at the apartment," and "there might be a little meth in the apartment."

¶6        Later that evening, officers executed a search warrant at Houston's apartment. Detectives testified they were searching for firearms and their components connected to the incident. During the search of the master bedroom, officers located multiple guns, including a handgun on a bed with a loaded magazine inserted. Officers also recovered an ammunition box from the bedroom containing "various drugs and packaging components." Inside the box, officers found several bags containing colored pills and crystal substances, including five blue-colored bags, four multicolored bags, eight bags containing crystal substances, and two bags containing numerous smaller Ziploc baggies. Forensic scientists from the crime laboratory tested the substances and confirmed the pills contained fentanyl and the crystal substances contained methamphetamine. At trial, testimony established that the seized narcotics included approximately 6,000 fentanyl pills and approximately 120 grams of methamphetamine.

### B.        Pre-Trial Proceedings

¶7        The State charged Houston with two counts of aggravated assault, a class 3 dangerous felony; one count of disorderly conduct, a class 6 dangerous felony; one count of possession of dangerous drugs for sale, a class 2 felony; and one count of possession of narcotic drugs for sale, a class 2 felony.

¶8        The State alleged multiple offenses not committed on the same occasion, aggravating circumstances, and historical prior felony convictions based on a separate pending felony matter. Specifically, the

State alleged that offenses charged in CR2024-101667-001 (the "2024 matter") constituted multiple offenses not committed on the same occasion for sentencing enhancement purposes under A.R.S. §§ 13-703 and 13-704. The State also alleged aggravating circumstances including threatened infliction of serious physical injury, use or threatened use of a handgun, commission of the offenses for pecuniary gain, and other factors relevant to Houston's character or the nature of the offenses.

**¶9** Houston appeared and was represented by counsel at his arraignment, where the court entered not guilty pleas on his behalf and set future pretrial proceedings. Houston was also present and represented at subsequent comprehensive pretrial conferences, complex case management conferences, trial management conferences, evidentiary hearings, jury proceedings, and sentencing.

**¶10** Houston also appeared and was represented during a Rule 17.4 settlement conference which included a *Donald* advisement, which is an on-the-record determination that a defendant has been advised of any proposed plea agreement, its terms and potential consequences. *See State v. Donald*, 198 Ariz. 406, 413 ¶ 14 (App. 2000). During that proceeding, the State outlined the charges and sentencing exposure in the present matter and the 2024 matter, including the possibility of consecutive prison sentences. The State offered plea agreements totaling 32.5 years' imprisonment. After discussing the plea offer and sentencing exposure with the court, Houston rejected the plea.

**¶11** Before trial, the State filed a notice of intent to introduce text messages recovered from a cellphone allegedly belonging to Houston, which the State argued reflected drug-trafficking activity and were admissible as direct, circumstantial, or intrinsic evidence of the charged drug-sale offenses. In the alternative, the State argued the messages were admissible under Arizona Rule of Evidence 404(b) to show knowledge, intent, plan, motive, opportunity, and absence of mistake. Houston moved to preclude the messages, arguing the State could not establish sufficient foundation connecting the phone and messages to him, that the messages constituted improper other-act or character evidence, and that any probative value was substantially outweighed by the danger of unfair prejudice under Rule 403. Houston further argued the messages were sent a month before the charged offenses and did not establish a sufficient connection between him and the drugs later discovered in the apartment, particularly because other individuals were present at the residence before officers executed the search warrant. After argument, the superior court concluded that, if the State established adequate foundation and presented

4

competent testimony regarding the meaning of the messages at trial, the messages would be admissible as "circumstantial and/or intrinsic evidence" rather than Rule 404(b) evidence because they could directly prove the charged offenses.

### C.     Trial

¶12     Trial began on September 30, 2024.  Houston appeared and was represented by counsel throughout the trial proceedings.

#### 1.     Counts 1-5

¶13     The State presented testimony from E.L., responding officers, detectives who searched Houston's apartment, forensic scientists, and narcotics experts.  E.L. testified to the collision and her encounter with Houston, including how he approached her vehicle holding a gun and demanded money after the accident.  Responding officers testified to Houston's statements at the scene that: he had a gun but did not point it at anyone; his son had taken the gun and; there might be methamphetamine in the apartment.  Officers also testified regarding Houston's 911 call, his empty holster, and the phone number associated with the call.  The officers who searched Houston's apartment testified they found an ammunition box containing fentanyl pills, methamphetamine, scales, and smaller baggies commonly associated with narcotics sales.  Another officer testified that three juveniles he understood to be Houston's children were removed from the apartment during the search.

¶14     The State also presented testimony concerning cell-phone extractions and text messages recovered from phones associated with Houston.  A narcotics detective testified regarding the meaning of drug-related slang in the messages, explaining that many of the texts appeared to concern fentanyl and methamphetamine transactions.  The detective further testified that the quantities recovered — about 6,000 fentanyl pills and about 120 grams of methamphetamine — were inconsistent with personal use and were instead consistent with possession for sale.

¶15     A forensic scientist with the PPD Crime Laboratory testified that testing confirmed the crystal substances recovered from Houston's apartment contained methamphetamine, including 28.21 grams in one tested bag and an additional 92.98 grams contained in seven other bags.  The forensic scientist also tested one pill recovered from the apartment and confirmed that it contained fentanyl.

¶16 During trial, the court excused Juror 9 without objection because of her chronic anxiety. Later in trial, another juror told the court Jurors 4 and 8 might not have taken seriously the court's admonition against discussing the facts before deliberation. After consulting with the parties, the court individually questioned both jurors, and each denied discussing the case or violating the court's admonition. Neither party requested further inquiry or objected to the court's handling of the matter. The court also excused Juror 6 without objection after learning they were unable to be in court timely after witnessing unrelated criminal activity. The court completed the trial with 13 jurors, including one alternate.

¶17 After the State rested, Houston moved for judgment of acquittal under Arizona Rule of Criminal Procedure 20. The State conceded the motion as to Count 1, and the court granted the motion on that count. The court denied the motion as to the remaining counts, finding substantial evidence supported submission of those charges to the jury. Houston did not testify. The parties did not object to the final jury instructions. Juror 11 was selected as the alternate juror.

¶18 During deliberations, the jury asked whether intimidation qualified as reasonable apprehension of immediate physical injury, and the court instructed the jury to rely on the elements and definitions contained in the jury instructions. The jury later advised the court it had reached an impasse on Count 2 but had reached verdicts on the remaining counts. The parties agreed not to provide an impasse instruction. The jury subsequently found Houston guilty of Counts 3, 4, and 5, while leaving Count 2 unresolved. The State later dismissed Count 2.

### 2. Aggravation Phase

¶19 During the aggravation phase, the jury found that Count 3 involved the use, threatened use, or possession of a deadly weapon or dangerous instrument, specifically a handgun. The jury also found aggravating circumstances as to Counts 4 and 5.

### D. Prior Conviction Stipulation and Sentencing

¶20 Before sentencing, Houston stipulated that he had been convicted in the 2024 matter following a bench trial before a different judge. Houston acknowledged he was convicted in that matter and that nobody forced or threatened him into stipulating to the convictions.

¶21 The court conducted the sentencing hearing in compliance with Houston's constitutional rights and Arizona Rule of Criminal

Procedure 26. The court considered the presentence report, the parties' sentencing memoranda, and aggravating and mitigating circumstances. The State argued Houston was a professional drug dealer based on the text-message evidence and requested aggravated consecutive sentences. Defense counsel requested concurrent presumptive sentences and emphasized Houston's age, family support, and lack of significant criminal history before 2023. Houston addressed the court and continued to maintain his innocence regarding the narcotics offenses but stated he would accept the sentence imposed by the court.

**¶22** The court sentenced Houston to four years' imprisonment for Count 3, eleven calendar years' imprisonment for Count 4, and ten years' imprisonment for Count 5. The court ordered the sentences to run concurrently with one another and concurrently with Houston's sentence in the 2024 matter. The court awarded 444 days of presentence incarceration credit on Count 5 and 484 days on Counts 3 and 4. The court also imposed fines based on the narcotics values presented at trial, statutory assessments and fees, ordered forfeiture of weapons and related items, and advised Houston of his appellate rights. Houston timely appealed.

## DISCUSSION

**¶23** We review the entire record for reversible error. *State v. Thompson*, 229 Ariz. 43, 45 ¶ 3 (App. 2012). Houston's counsel advised this court that after a diligent search of the entire record, counsel found no arguable questions of law. We have read and considered counsel's brief and fully reviewed the record for reversible error, *see Leon*, 104 Ariz. at 300, and find none. All of the proceedings were conducted in compliance with the Arizona Rules of Criminal Procedure. So far as the record reveals, counsel represented Houston at all stages of the proceedings, and the sentences imposed were within the statutory guidelines. We decline to order briefing and affirm Houston's convictions and sentences.

## CONCLUSION

**¶24** For the foregoing reasons, we affirm. Upon the filing of this decision, defense counsel shall inform Houston of the status of the appeal and of his future options. Counsel has no further obligations unless, upon review, counsel finds an issue appropriate for submission to the Arizona Supreme Court by petition for review. *See State v. Shattuck*, 140 Ariz. 582, 584–85 (1984). Houston shall have thirty days from the date of this decision to proceed, if he desires, with a pro per motion for reconsideration or petition for review.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**: JR